## SWILLEY & RILEY vs. LYON & BAKER.

1. A charge by a commission merchant of five per cent., in addition to legal interest, for accepting and advancing the money to pay a bill or draft, drawn on him by a customer, without funds in hand, if intended merely as a fair compensation for the risk, trouble, and expense incurred, is not illegal.

2. One who unites with another, as his surety, in drawing a bill, in the absence of proof limiting his liability, is to be considered as assuming all the duties and liabilities of drawer to each of the parties to the bill, and is consequently liable to the accommodation acceptor, not only for the amount of the bill, in case the acceptor has it to pay, but for the usual commissions incident to its acceptance and payment.—(CHILTON, J., dissenting from the latter branch of the proposition.)

3. If a party die in possession of goods, and they come into the hands of his administrator, the title is changed, and a factor, who may afterwards receive the goods from the administrator, cannot hold them or their proceeds, on account of advances made to the deceased in his life-time, without the assent of the administrator.

ERROR to the County Court of Sumter. Tried before the Hon. Preston G. Nash.

HUNTINGTON, for the plaintiffs in error :

1. The custom of charging five per cent. above legal interest

for accepting and advancing, is a custom against law.—Kent v. Lowen, 1 Camp. 177; Dunham v. Dey, 13 Johns. 40; Dunham v. Gould, 16 ib. 367.

2. But in any event, the service was rendered to Grant only, for whose accommodation the bill was drawn and who got the money; thereupon Swilley & Riley ought not to have been charged with the per centage. Swilley & Riley were sureties, if their names were placed on the bill for the accommodation of Grant.—Burge on Suretyship, 485.

3. A factor has a right to retain funds in his hands to meet his acceptances in favor of the consignor, or to reimburse himself for advances made upon the faith of the consignment.—Brown & Co. v. McGran, 14 Pet. 479; Tiernan v. Jackson, 5 ib. 580. The lien of the factor, previously inchoate, was complete when the cotton was received, and related back to the time when the acceptance was given. The death of a party does not prevent a sheriff from levying an execution which had created a previous lien on the goods and chattels of the deceased.—Collingsworth v. Horn, 4 S. & P. 433; Henderson et al. v. Gandy's Adm'r, 11 Ala. 431. It is a familiar principle, that if a creditor parts with or renders unavailable any securities or funds which he would be entitled to apply in discharge of his debt, the surety becomes exonerated *pro tanto.*—Cullum v. Emanuel & Gaines, 1 Ala. 23. If, therefore, Lyon & Baker had the right to retain the funds in hand to meet their acceptance, and parted with those funds, the securities were released. In Mauldin & Montague v. Armistead, 14 Ala. 702, the consignor had himself conveyed away the crop before its consignment; in that case no rights of sureties were involved, yet the court in the last paragraph but one of the opinion, intimate that the consignees, who were accommodation acceptors, might have relief in a court of equity. In the case at bar, the administrator held the cotton not adversely to F. M. Grant, but in his place and stead, and was bound to submit to whatever disposition of it Grant would have been bound to submit to if living. The question was one between Grant's sureties, who had become so in expectation of his providing funds for their relief, and his creditors at large, and his distributees. Under these circumstances, the plaintiffs in error had a paramount equity, which was destroyed by the acts of Lyon & Baker.

37

R. H. SMITH, for the defendants:

1. The charge asked by plaintiffs in error, that the charge of 5 per cent. is usurious, and the charge given by the court, are covered by the case of Brown v. Harrison et al., 17 Ala. 774. This was no case of lending money, in any sense. It was an acceptance of the bill of plaintiffs in error by defendants. The bill was put on the market and sold, and defendants had no interest in it, until by the failure of plaintiffs to meet it, defendants were compelled to take it up with their funds. The charge of the court was in accordance with the case last cited, and left the question of the character of the transaction to the jury.

2. If plaintiffs in error were bound to refund, they were also bound to pay a reasonable compensation for trouble and risk incurred by their breach of promise. It was an acceptance and payment for each and all the drawers; their relation of principal and securities, the defendants had nothing to do with. They (the defendants) did not own the bill. The right to commissions grows out of the acceptance and payment, and is equally a right against all who drew. The idea that the undertaking by Lyon & Baker was one personal for Grant, is without foundation. Each drawer requested the defendants to accept, and each thereby promised, if they would, to provide for its payment. The right to commissions being a right to compensation for risk and trouble, applies as well to one as to another of the drawers.

3. Conceding, for argument, that Lyon & Baker could have retained the proceeds against the bill, it was a mere right in them to do so. They surely had no such lien as enured to the benefit of the plaintiffs in error.—Woodward et al. v. Clegg, 8 Ala. 317, and authorities there cited. But they could not have retained first, because there was no agreement to that effect, and no sum due which could be ascertained without a jury.—Mauldin, Montague & Co. v. Armistead, 14 Ala. 710-11. Secondly, Grant might have sent his cotton to whom he pleased, or sold it to another.—14 Ala., supra. The administrator of Grant might or might not have shipped to Lyon & Baker. Having done so, it went as his property, subject to his control, and Lyon & Baker were bound to pursue his orders respecting it. It is not true, in the broad sense contended for, that the administrator stood in the same condition of deceased, respecting

the estate of deceased. He is clothed with a special power; he could only have sold by order of court, and the appropriation of the money was not left to his discretion, but was prescribed by law. If the estate were insolvent, he could do nothing with the money but bring it into court to be apportioned equally among the creditors.

DARGAN, C. J.—The facts of this case, so far as they are material to the understanding of the questions of law raised by the assignments of error, may be thus stated : In May 1847, F. M. Grant, a planter residing in Sumter county, applied to Lyon & Baker, the plaintiffs below, who were commission merchants in Mobile, for an advance of money, but they declined to let him have it. He then solicited the acceptance by the plaintiffs of a bill of exchange, drawn jointly by Swilley & Riley and himself, for thirteen hundred and eighty-one dollars and twenty-two cents, dated the first of May 1847, and due at nine months. This bill the plaintiffs agreed to accept, and Grant presented a blank, with the names of himself, Samuel Swilley and Cornelius Riley signed to it, and it was filled up in the form of a bill of exchange and accepted by Lyon & Baker, and made payable to the order of Robert A. Baker, one of the firm of Lyon & Baker, and by him endorsed. This bill was afterwards negotiated to Jones Fuller, and upon its maturity, it was paid by the acceptors. The money obtained on the bill from Fuller was paid to Grant. At the time the bill was accepted, Lyon & Baker had no funds in their hands belonging to the drawers, nor to either of them, and they paid the bill with their own funds. They charged the drawers five per cent. for accepting and paying the bill, which is part of the sum sought to be recovered, and proved that it was the regular custom for commission merchants in Mobile to charge five per cent. for accepting and advancing the money on bills of exchange, accepted by them for the accommodation of the drawers, which sum was an additional charge to the lawful interest on the amount of the bill after its maturity. It was also shown that it was not usual for commission merchants to accept bills of exchange for planters, but upon the promise or expectation that the planter would ship his cotton to them, for the purpose of being sold and of their being thus put in funds to pay the bill, or to pay them-

selves, if they had taken it up.  It further appeared, that Grant
died before his crop of cotton, raised in the year 1847, had
been shipped, and that his administrator, Willis Ball, shipped
to the plaintiffs the crop raised on his plantation that year, which
they had sold for over two thousand dollars, but they paid the
entire amount to the order of the administrator, and did not re-
tain the amount due to themselves on account of their accepting
and paying said bill.  The defendant's counsel requested the
court to charge the jury, that the custom proved to exist among
commission merchants in Mobile of charging five per cent., in
addition to legal interest, for accepting and advancing, was a
custom against law, which charge the court refused to give, but
instructed the jury that the plaintiffs were entitled to a reason-
able compensation for accepting and advancing, and if the jury
believed five per cent. to be reasonable, they should allow it.
The defendants excepted to the charge given, and also to the
refusal to charge as requested.

1.  The ruling of the court in refusing to give the charge
requested, as well as in the charge given, is fully vindicated by
the decision of this court in the case of Brown v. Harrison &
Robinson, 17 Ala. 774.  We there held that a charge by a
commission merchant of five per cent., in addition to legal in-
terest, for accepting and advancing the money to pay bills drawn
on him by his customers, if intended as a fair compensation for
the risk, trouble, and expense incurred, is not usurious.  We
are fully satisfied that this opinion is in consonance with the
well settled principles of commercial law.  It is true, that if
the transaction was a device to evade the statute against usury,
then the mere form of the contract could not relieve the party
seeking to enforce it from the consequences of usury; for mere
device or shift cannot purge the contract, if it be tainted with
*the intent to take* more than lawful *interest by way of loan.*  But
if there is no loan of money by the party claiming such com-
missions, and they are charged for risk and trouble incurred at
the request of the drawer, neither the statute, nor morality, for-
bids reasonable compensation for such risk and trouble.—Floyer
v. Edwards, Cowper, 112; Ketchum v. Barker, 4 Hill, 224;
Barnes v. Fry, 15 Ves. 120; Brown v. Harrison & Robinson, *sup.*

2.  The defendant also requested the court to charge the jury,
that if they believed from the evidence that Swilley & Riley

were the securities of Grant, and this known to the plaintiffs, then the charge of five per cent. for accepting and advancing was one personal to Grant, and for which his sureties (the defendants) were not liable, which charge the court refused. We propose to examine, whether the defendants are liable for any part of the amount, and if so, whether for the usual commissions incident to accepting and paying a bill for the accommodation of the drawer. There are two cases decided by the Supreme Court of New York, which would discharge the defendants from all liability.—See Griffiths v. Reed, 21 Wend. 502, and Wing v. Terry, 5 Hill, 160. These cases go upon the grounds that the liability of a joint drawer, who is a mere security, extends to the payee or other holder of the bill alone, and even if he drew the bill, with the understanding that he should be liable to the acceptor, still such a contract must be considered as a parol promise to pay the debt of another, and consequently within the statute of frauds. In my opinion, these decisions are incorrect. It is true, that the liability of such a drawer may be limited to the payee or other holder only, if such were the terms of his contract, but if he intended by drawing the bill to become liable, not only to the holder, but also to the accommodation acceptor, I can see no reason why he should not be so held. I think the principle is well settled, that an accommodation acceptor is to be treated as the principal debtor by the holder of the bill, but in respect to the drawer, that is, as between themselves, drawer and acceptor, such an acceptor is to be treated to all intents and purposes as a mere security.—In re Babcock, 3 Story, 393, and the cases there cited. As such an acceptor is to be considered a security for the drawer, it follows that he is entitled to be indemnified, for the principal is bound to indemnify his security. Nor is this liability of the principal necessarily dependent on any parol promise, independent of the obligation that results from his written contract, but it grows out of, and is part of the contract itself, and he who joins the principal in such a contract, with the intent to become his security, is as completely bound by a written contract as is the principal himself. The correct rule, in my judgment, is this; every one who draws a bill, whether alone or jointly with another, is to be considered as assuming all the liabilities growing out of his character as drawer, unless, indeed, he be a mere

security for his co-drawer, and the evidence shows that it was the intention of the parties that he should be bound to the payee or holder alone, and not to the acceptor. But in the absence of proof thus limiting his liability, he must be considered as assuming all the duties and liabilities of a drawer to all who are parties to the bill, and if the drawee be a mere accommodation acceptor, each and every drawer is bound to indemnify him. Having attained the conclusion that the defendants are bound as drawers to indemnify the plaintiffs as accommodation acceptors, I think it follows that they are bound for the usual commissions incident to accepting and paying such a bill. It does not appear that the blank was filled up in the form of a bill, contrary to the intention of all the parties. We should, therefore, infer that it was done as they intended, and that they further intended to assume all the liabilities that usually followed the drawing of bills without funds in the hands of the drawee. It is certainly true that a security is only bound to the extent of his contract, but the extent of the contract of these defendants, in my judgment, is, to indemnify the plaintiffs, and to pay them the usual commission for accepting and paying, without having funds of the drawers in their hands. This being the extent of the liability intended to be assumed by the defendants, there can be no legal objection to holding them bound to this extent. They are drawers of a bill, without having funds in the hands of the drawees; they, therefore, are bound as such to pay, not only the amount of the bill itself, but the usual commissions for accepting and paying. I am sustained in the view I have here taken, by Judge Story, who disapproves of the case of Griffiths v. Read, 21 Wend., and says that if A. and B. draw a bill, without having funds in the hands of the acceptor, and B. is the security of A., both must be considered as drawers, to all the parties to the bill, as well to the acceptor as the payee, for the acceptor may have been induced to accept the bill, quite as much as the payee or other holder to take it, because B. as surety of A. was liable to him for payment in the character of joint drawers.—Story on Bills, § 420.

3. The court was further requested to charge the jury, that if they believed the defendants were the securities of Grant, they were discharged by the failure of the plaintiffs to appropriate the proceeds of the cotton received from Grant's administrator to

the payment of the bill. If the plaintiffs had a lien on the cotton received from Grant's administrator to secure the payment of the bill, I should hold that their failure so to appropriate the cotton would discharge the defendants. But they had no lien on the cotton to pay this debt. The lien of a factor consists in the right to retain the goods of his principal, or the proceeds thereof, until some charges incident thereto, or advances made by him to the principal, be paid. This right of retainer presupposes, however, possession in the factor, without which it cannot exist. Judge Story says, that the general lien of a factor will attach, not only to goods which have actually come into his possession in the life-time of the principal, but also to goods which are in *transitu* to the factor at the time of the principal's death, and which afterwards came to his possession.—Story on Agency, § 377. But this is certainly the farthest extent that the lien of a factor can be carried. It can never be allowed to attach on the goods of the principal before he parts with the possession; and if the principal die in possession of the goods, and they afterwards come to the possession of his administrator, the title is changed, and a factor, who may receive them from the administrator, cannot be permitted to hold them for advances made to the deceased in his life-time, without the assent of the administrator. To allow this might often lead to an entire change of the order of the payment of the debts. Thus, it is the duty of an administrator in this State to pay the debts *pro rata*, if the assets be insufficient to pay all, and in England it is his duty to pay them in a certain prescribed order; but if we were to allow a factor a lien for advances made the deceased in his life-time, when he received the goods from the administrator, we might permit him to receive the entire amount of his debt, to the exclusion of all other creditors. Indeed, the lien of a factor extends only to the goods of the principal in his possession, actual or constructive. If the principal part with his title before the factor obtains possession, he cannot charge the goods with the advances made the principal, without the consent of him, who is the owner of the goods. It is manifest that the plaintiffs had no lien on the cotton, for it was not even gathered from the field at the time of Grant's death. It was gathered by the administrator, and by him and as his shipped to the plaintiffs, and he gave them no authority to retain the pro-

ceeds in satisfaction of the debt due to them from the estate of Grant. These instructions, therefore, were properly refused.

After the most deliberate consideration of this case, I am satisfied that there is no error in the record, and the judgment is affirmed.

CHILTON, J., dissenting, said he thought it exceedingly clear that the opinion of the majority of the court mistook the the law, as to the right of the plaintiffs in this case to recover the commissions against Swilley & Riley, who made no promise and assumed no liability, other than by merely putting their names upon the bill as securities for the other drawer—the fact of their being but securities having been known to the plaintiffs at the time they accepted and paid the bill. Conceding the bill, after its payment, was evidence of a written contract, upon which, connected with proof of its payment by the plaintiffs, as accommodation acceptors, the law raises an implied promise to pay, upon which an action would lie as against Swilley & Riley, the securities, (a proposition difficult to maintain upon principle and legal analogy,) yet they cannot be held bound beyond the liability as ascertained by their written contract. The security has the right to repose upon the terms of his contract. S. & R. made no contract to be responsible to the plaintiffs for commissions for accepting and paying the bill, nor is it shown that they even knew that the blank was to be filled up so as to make them the drawers of a bill. If then they can be made liable for such commissions, they are charged beyond their contract,—upon some *other* contract or liability. To explain more fully, suppose the acceptors had not paid the bill, but S. & R. had paid it, they would then have satisfied their undertaking. Now could the acceptors in that case have sued them for the commissions for accepting? There is no principle of law which would justify such an action. To hold that the law in such cases would imply a promise to pay on the part of the surety, would be to charge the sureties beyond and outside the contract. It would, furthermore, enable the plaintiffs to recover upon an implied contract, which if it had been express, but verbal, would have been directly obnoxious to the statute of frauds, as an agreement to answer, on the part of S. & R., for the default of Grant in failing to pay these commissions to the plaintiffs.